IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MIKE'S AUTO BODY OF GLENWOOD
CITY, LLC and MICHAEL BARSTAD,

                Plaintiffs,            OPINION AND ORDER

v.

                                        24-cv-295-wmc

ST. CROIX COUNTY and SCOTT KNUDSON,

                Defendants.

---

      Plaintiff Mike's Auto Body of Glenwood City, LLC and its sole owner, plaintiff Mike Barstad, have filed this civil action under 42 U.S.C. § 1983, claiming that defendant Sheriff Scott Knudson, acting as a final policymaker for defendant St. Croix County, Wisconsin, terminated Mike's Auto Body's participation in the county's towing rotation list without notice or a hearing in violation of the Due Process Clause of the Fourteenth Amendment.  As such, plaintiffs bring their claim against the county itself under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  (*See* dkt. #39, at 13-14.)  Plaintiffs further claim the termination was an act of retaliation for an email that Barstad had sent to other towing operators in May 2023 in violation of the First Amendment.  Currently pending before the court is (1) plaintiffs' motion for partial summary judgment on the issue of liability (dkt. #18) and (2) defendants' motion for summary judgment on plaintiffs' constitutional claims and request for punitive damages (dkt. #25).  For the reasons explained below, the court will deny plaintiffs' motion for summary judgment and grant defendants' motion for summary judgment on the merits of plaintiffs' claims.

## UNDISPUTED FACTS[1]

### A. Background

Plaintiff Mike's Auto Body of Glenwood City, LLC provides vehicle towing and other automobile services in Glenwood City, Wisconsin. Plaintiff Michael Barstad is the sole owner and managing member of Mike's Auto Body. Defendant Scott Knudson is the sheriff of defendant St. Croix County, Wisconsin.

Since approximately 2008, St. Croix County has maintained a "no-preference" towing rotation list to arrange for the removal of disabled, abandoned or other vehicles from county roads. Deputy sheriffs use the list when a vehicle owner does not express a preference as to which towing company should be engaged. Mike's Auto Body was included in the county's towing rotation for several years. According to Barstad, being on the list provided a financial benefit to his company by allowing it to charge the vehicle owners for towing services.

### B. The 2022-2023 Towing Season and Requirements

The no-preference towing rotation list was updated annually, and automatic renewal for the companies on last year's list was not allowed. In February 2022, the St. Croix County Sheriff's Office published a newspaper advertisement for applications to participate in the no-preference tow program for the 2022-2023 season, which ran from July 1, 2022, through June 30, 2023. Applications were due by May 2, 2022, which required companies to disclose basic information about the vehicles and employees that would provide towing services. On April 5, 2022, the Sheriff's Office also forwarded via email its "2022-2023 agreement and application

---

[1] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact and response and material and undisputed for purposes of summary judgment.

for drivers and vehicles" to its current tow group, including Mike's Auto Body, and asked that everything be completed by May 8, 2022. An attachment to that email entitled "St. Croix County Sheriff's Office No-Preference Tow List Requirements 2022 – 2023" and "St. Croix County Sheriff's Office No-Preference Tow Services *Equipment and Other Service Requirements*," states that:

> The St. Croix County Sheriff's Office allows resident towing companies to participate in a no-preference towing rotation under the following terms and conditions. Once a tow company meets the minimum requirements and is placed on the no-preference List the company must follow all terms and conditions outlined in this document. Failure to abide by the terms and conditions may result in the company's removal from said list. The decision to admit or exclude a company from participation in this program, for cause, is solely that of the St. Croix County Sheriff.

(Dkt. #13-1, at 2.) The same attachment further set forth requirements under subheadings "General Policies," "Business Requirements," "Costs/Fees," "Operators," "Tow Trucks," "Safety," and "Service Areas." The General Policies section states that "[a]ny violation of applicable rules or laws or failure to meet the standards herein may result in suspension or exclusion from the call-out list." (*Id*.)

Barstad submitted an application on behalf of Mike's Auto Body on April 19, 2022, requesting to be part of "Zone C," which included Hammond, Pleasant Valley, Rush River, Emerald, Baldwin, Eau Galle, Forrest, Glenwood, Springfield, and Cady townships. Barstad also submitted an application on behalf of his other towing company, Glenwood Towing, similarly requesting to be part of Zone C. Both of Barstad's applications were approved on May 24, 2022, and the following day, May 25, all tow operators who were on the 2022-2023 towing rotation list were sent an email notifying them that use of that list would end on June 30, 2023.

### C. Recurring Issues Between Parties

Beginning as early as 2017, the St. Croix Sherriff's Office began receiving complaints about Mike's Auto Body and Glenwood Towing. On June 13, 2017, therefore, Captain Jeffery Klatt circulated a new St. Croix County Sheriff's policy that neither Mike's Auto Body nor Glenwood Towing were to be used for towing any vehicles owned by the *county*. After defendant Scott Knudson took office as the new county sheriff, he confirmed that, at least as of August 26, 2019, the Sheriff's Office would still not use Barstad's companies to tow county vehicles, although Barstad was never notified of this policy.

In 2022, patrol sergeants documented what were at least three, different concerns with Mike's Auto Body and Glenwood Towing. Then on April 4, 2023, Barstad emailed Lieutenant Charles Coleman at the Sheriff's Office to advise him that unless a sheriff's deputy remained on scene with the vehicle owner, he would no longer send a tow truck without first obtaining a down payment on his towing fee from the vehicle owner. Barstad further explained that his new procedure would add at least 15-20 minutes to his response time. Lieutenant Coleman passed along Barstad's concerns to Sheriff Knudson. At summary judgment, Coleman and Knudson now aver that a 15 or 20-minute delay in response time is problematic and not preferable for the county, as the objective of the towing rotation is to clear county roadways as safely and efficiently as possible, although it is unclear if Barstad was advised of their concerns with his position at that time.

### D. Barstad's Email Concerning 2023 Incident

On May 6, 2023, a St. Croix County Deputy Sheriff, Kaitie Leising, was shot and killed in the line of duty, while interacting with a motorist who had driven off the road into a ditch. A short time later, the motorist went into adjacent woods and shot himself. A vehicle involved

4

in that event was later towed by Mike's Auto Body to its facility. Because the incident involved the death of a Wisconsin law enforcement officer, the Wisconsin Department of Justice ("DOJ") Division of Criminal Investigation opened an investigation.

On Friday, May 12, 2023, less than a week after these tragic events, Barstad sent an email to several other towing service operators in St. Croix County, who like him were members of the Western Wisconsin Towing Association ("WWTA"). That email stated:

> We towed in one of the vehicles from the shooting. We have been dealing with that shit show all week with investigators etc.
>
> The owner picked it up today. DOJ Agent comes in right behind him and says they are going to pay the bill.
>
> Owner signs, DOJ has no tax information or anything. The bill was $374 including $35 admin for dealing with everyone on it[,] plus storage. Everything was billed right off our agreement with the sheriff. The agent then says we are gouging.
>
> Then the agent tells me it is an unfortunate situation[,] and they want the bill lowered and they don't want to pay the storage.
>
> All I have to say is what a f'n joke.
>
> I am assuming then that he isn't getting paid and is working the case for free since it is an unfortunate situation.
>
> I am beyond pissed. I am sick of most of this shit with the sheriff and the government. Either they don't do anything with the bills for years and years or then we have to discount bills as if it is our problem.
>
> As a group, I feel we can't get anything put together and deal with the sheriff's department. We have members that aren't responding or are upset for one reason or another and so instead of sitting at the table and discussing, they don't respond to emails or come to the meetings. Unfortunately, some have never come to any meetings. If we don't start working together and work out our differences[,] then we are wasting our time with the association we have created.

5

> I am hoping to get some input as to if we are going to start working together or we are going to fold on the association. I don't care to keep wasting my time sending emails, and going to meetings if we aren't all going to participate and make a difference.
>
> Mike

(Dkt. #13-2, at 2.)

One of the towing operators to whom Barstad sent his email, Kirk Hexum, forwarded it to Lieutenant Coleman, who then brought it to the attention of Sheriff Knudson. On May 25, 2023, Knudson sent Barstad an email, stating:

> Well Mr. Barstad, you have gotten more than my attention.
>
> To make your interaction with the DCI agent, with no sheriff's office involvement in the discussion, the time to lash out at me and my office as we work through the murder of my deputy, has brought me to the point of no return with you. No need to worry about this happening again, you will NEVER be utilized in any situation or scene where we choose the towing service.
>
> You have crossed such a line of humanity choosing this incident to blast me, this office, and those involved in this investigation, that I will be moving towards dissolving the towing agreement.
>
> "I am assuming then that he isn't getting paid and is working the case for free since it is an unfortunate situation." You[r] comments are heartless, and I'm sickened by your response.

(Dkt. #13-2, at 1.)

On June 29, 2023, Sheriff Knudson sent Barstad another email, stating:

> I can't tell you how hurt, disappointed and upset my staff and I are from your email comments after Kaitie's murder.
>
> Prior to that, several members of my staff had felt uncomfortable while you were the wrecker on scene, in regards to comments you were making to them in regards to the sheriff's office.
>
> After conferring with St. Croix County Corporation Counsel, I have made the decision to limit our contact with you and your

6

>business, and remove you from the towing rotation as of July 1, 2023.

(Dkt. #19-2, at 1.)

While Mike's Auto Body and Glenwood Towing remained on the county's 2022-2023 no-preference towing rotation and received towing assignments through June 30, 2023, the companies were not invited to apply for the 2023-2024 no-preference towing rotation. Nonetheless, Barstad submitted an application to join the 2023-2024 towing rotation on July 11, 2023, but his application was denied without an opportunity to be heard on the matter.

## OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. However, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial. *E.g., Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiffs must "do more than simply show that there is some metaphysical doubt as to the material facts." *Anderson*, 477 U.S. at 256-57, 261. Thus, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Id.* at 248.

As previously explained, plaintiffs assert that defendants violated their rights to free expression under the First Amendment and to notice and a hearing under the Due Process Clause of the Fourteenth Amendment. While plaintiffs maintain that the evidence establishes that they are entitled to summary judgment on the question of liability under the First Amendment and Due Process Clause, defendants move for summary judgment on the grounds that: (1) plaintiffs do not have a property interest protected by the Due Process Clause in remaining on the county's towing rotation list; (2) defendants did not violate the First Amendment because Barstad's email did not involve a matter of public concern, nor was it a substantial or motivating factor in the county's decision not to include Mike's Auto Body in the 2023-2024 towing rotation list; and (3) the shareholder standing rule prevents Barstad from bringing any individual claim against defendants because any injury he suffered was derivative to that suffered by Mike's Auto Body. Alternatively, defendants contend that Knudson is entitled to qualified immunity as to all claims, and plaintiffs are not entitled to punitive damages based on the evidence of record. Plaintiffs concede that Barstad lacks standing to bring a due process claim but opposes all of defendants' remaining arguments.

As explained below, the court concludes that both of plaintiffs' constitutional claims fail on the merits, so it is unnecessary to consider defendants' other arguments regarding standing,[2] qualified immunity, or punitive damages.

## I. Due Process Claim

The Fourteenth Amendment prohibits states from making or enforcing any law depriving a person of life, liberty, or property without due process. However, property interests

---

[2] Normally, the court would address this standing issue first, but since jurisdiction over defendants' dispute with Mike's Auto Body established subject matter jurisdiction, it need not.

8

"are not created by the [United States] Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source," such as state laws, ordinances, and contracts. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The Seventh Circuit has recognized that internal rules or policies may create property interests, but only when they have "the force of law." *O'Hare Truck Serv., Inc. v. City of Northlake*, 47 F.3d 883, 886 (7th Cir. 1995), *rev'd on other grounds*, 518 U.S. 712 (1996). "Because property interests are defined by reference to state law," this court must examine Wisconsin law to determine if it supports plaintiffs' claimed property interest. *Id.* (internal citation omitted).

Here, plaintiffs cite no statute or ordinance giving rise to a property interest in the continued inclusion of Mike's Auto Body in the county's towing rotation list. Rather, they cite the following language in the No-Preference Tow List Requirements, which the county published in writing and distributed to towing service providers in both 2022 and 2023:

> Once a tow company meets the minimum requirements and is placed on the no-preference List[,] the company must follow all terms and conditions outlined in this document. Failure to abide by the terms and conditions may result in the company's removal from said list. The decision to admit or exclude a company from participation in this program, for cause, is solely that of the St. Croix County Sheriff.

(Dkt. #13-1 and #34-3.) Without a Wisconsin statute or case law explicitly recognizing a property interest based on this type of policy, plaintiffs instead argue that the meaning of "force of law," as interpreted in *O'Hare* under Illinois law, should be read expansively to include defendants' towing requirements.

In support of their argument, plaintiffs direct the court to the meaning of "law" in the context of Wisconsin's governmental immunity jurisprudence. *See Meyers v. Schultz*, 2004 WI

9

App 234, ¶ 19, 277 Wis. 2d 845, 690 N.W.2d 873 ("'Law' includes 'statutes, administrative rules, policies or orders; it includes plans adopted by a governmental unit; it includes contracts entered into by a governmental unit.'").  Plaintiffs also cite to other Seventh Circuit opinions holding that various types of manuals, customs and practices, and other assurances may create a legitimate claim of entitlement protected by the Due Process Clause.  *E.g., Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 773-74 (7th Cir. 2021) (operators of long-term nursing care facilities entitled to legally-prescribed Medicaid reimbursement rates); *Gorman v. Robinson*, 977 F.2d 350 (7th Cir. 1992) (Chicago Housing Authority pamphlet regarding just cause employment); *Vail v. Bd. of Educ. of Paris Union Sch. Dist. No. 95*, 706 F.2d 1435, 1438 (7th Cir. 1983), *aff'd*, 466 U.S. 377 (1984) (implied contract for continued employment).

However, this court recently considered and rejected these same arguments on similar facts in another challenge to exclusion from a county's towing list, holding that "these cases neither demonstrate that Wisconsin law has adopted plaintiffs' broad interpretation of 'force of law,' nor that policies setting minimum standards for towing lists create a protected property interest." *Tire Town Auto LLC v. Wood Cnty.*, No. 24-cv-282-wmc, 2025 WL 1220286, at *3 (W.D. Wis. Apr. 28, 2025).  Indeed, many circuits have held that there is no property interest in towing assignments where no contract, statute, regulation, or case law supported the relationship, even in cases in which the towing company has a long tenure on the tow list.  *See id.,* at *2 (summarizing cases); *S&S Rsch., Inc. v. Paulszcyk*, 44 F. App'x 744, 746-47 (7th Cir.

2002) (failing to identify any Wisconsin case recognizing legal entitlement based solely on length of service and policy of removing operators from towing list only for sufficient cause).³

Even if the court were to accept that the county's towing rotation requirements have the force of Wisconsin law sufficient to create a protected property interest, plaintiffs' claim still falls short legally.  Plaintiffs concede that Mike's Auto Body and Glenwood Towing were not *removed* from the county's towing rotation during the 2022-23 term.  Rather, Knudson denied *their applications* for inclusion in the new list for the 2023-24 term.  Therefore, to survive summary judgment, plaintiffs would have to prove that there was a binding obligation to keep Mike's Auto Body on the towing rotation for the new season.  However, they have failed to meet this burden.

Specifically, in support of their contention that towing companies had a property interest in *continued* inclusion on the towing rotation, plaintiffs point to the following:  (1) the for-cause limitation in the requirements applies equally to decisions to "admit," as well as "exclude," a company's participation on the new towing rotation list; (2) Knudson stated in his April 2023 email to Barstad that he would move toward dissolving "the towing agreement"; and (3) Coleman referred to the 2022-23 requirements as an "agreement" in an email to tow operators, asking them to complete the application for the 2022-23 season.  Unfortunately for plaintiffs, the county's requirements neither state that companies participating in previous years would automatically be renewed absent cause for termination, nor do the vague references by Knudson and Coleman about an "agreement" demonstrate that the county made a promise,

---

³ While plaintiffs correctly point out that this case is an unpublished, older order that may not be cited pursuant to Seventh Circuit Rule 32.1(d), no such prohibition has been recognized at the district court level, and the *S&S* opinion provides some guidance on the issue. *See Tire Town*, 2025 WL 1220286, at *2 (finding same).

11

express or implied, much less entered into a binding, legal contract to continue the relationship with Mike's Auto Body or Glenwood Towing beyond the 2022-23 season, which ended on June 30, 2023. To the contrary, if that were the case, the county would neither require companies to *reapply* every year, nor grant the sheriff discretion to select which towing services to place on the new rotation list each year. *Seiber v. City of Belleville, Illinois*, No. 17-cv-01377, 2018 WL 4144497, at *4 (S.D. Ill. Aug. 30, 2018). Indeed, "a property interest in a benefit" is "more than an abstract need or desire" or a "unilateral expectation" for it. *Roth*, 408 U.S. at 577. Accordingly, plaintiffs have not shown a "legitimate claim of entitlement" to be put on the new list and had no property interest protected by the Fourteenth Amendment. *Am. Soc. of Cataract and Refractive Surgery v. Thompson*, 279 F.3d 447, 455 (7th Cir. 2002). As such, defendants are entitled to summary judgment with respect to plaintiffs' due process claim.

## II. First Amendment Claim

A First Amendment retaliation claim has three basic elements: (1) the plaintiff must be engaged in protected speech; (2) the defendant took action that would dissuade the average person from similarly speaking out; *and* (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take the retaliatory action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020); *Harnishfeger v. United States*, 943 F.3d 1105, 1112-13 (7th Cir. 2019); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Ultimately, if plaintiff makes this showing, a defendant may still prevail by showing it would have inflicted the deprivation anyway, its but-for cause. *Id.* Defendants challenge plaintiffs' ability to satisfy both the first and third elements, but the first element alone is dispositive.

Determining whether Barstad's May 2023 email to other towing companies is protected by the First Amendment is a question of law that involves multiple steps. *Harnishfeger*, 943 F.3d at 1113. As an initial matter, the parties agree, as they must, that plaintiffs are public contractors who are subject to the same First Amendment limitations as public employees. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 718-20 (1996); *Board of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996); *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 471 (7th Cir. 2018). A First Amendment retaliation claim brought by a public contractor is, therefore, subject to two, threshold inquiries and a balancing test: (1) whether the contractor spoke as a private citizen or pursuant his official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006); (2) whether the contractor spoke on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); and (3) whether the government's interest in promoting effective and efficient public service outweigh the contractor's interest in commenting on matters of public concern, *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). *See also Friends of Blue Mound State Park v. Wisconsin Dep't of Nat. Res.*, 654 F. Supp. 3d 807, 819-20 (W.D. Wis. 2023) (citing *Umbehr*, 518 U.S. at 675-76, 678) (summarizing inquiries for public employees and contractors).

Defendants' challenge to plaintiffs' First Amendment claim focuses on the second inquiry -- public concern. *See Harnishfeger*, 943 F.3d at 1113 (court need not engage in *Pickering* balancing if plaintiff cannot prevail on double threshold established by *Garcetti* and *Connick*). "Whether [a contractor's] speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-148, and n.7. Here, defendants argue that Barstad's email concerned a personal grievance with the DOJ agent who wanted him to reduce a towing bill, as well as with

13

the Sheriff's Office and county government for failing to "do anything with [his companies' towing] bills for years and years." (Dkt. #13-2, at 2.) For their part, plaintiffs correctly point out that Barstad was seeking to rally a few of his fellow towing operators to work together through a trade association to preserve their personal financial interests. However, not all matters that "transpire within a government office are of public concern." *Connick,* 461 U.S. at 149. "While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their [contractors], the First Amendment does not require a public office to be run as a roundtable for [contractor] complaints over internal office affairs." *Id*. In contrast, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84 (2004).

Contrary to the speech in the cases cited in plaintiffs' opening brief (*see* dkt. #21, at 11-13), Barstad's email did not touch on broader public concerns with politics, corruption, safety, or efficiency. *E.g., O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) (towing operator allegedly removed from city's rotation list for refusing to contribute to mayor's reelection campaign and supporting mayor's opponent stated First Amendment retaliation claim); *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (towing operator's participation in state's investigation of officers' alleged illegal conduct constituted matter of public concern); *A. Kelley's Garage, Inc. v. Vill. of Stone Park*, No. 03-cv-2758, 2005 WL 991768, at *1 (N.D. Ill. Apr. 19, 2005) (First Amendment prohibits municipal entity from terminating services of towing company because of its political affiliation); *see also S&S*, 44 F. App'x at 745 (towing operator's speech in a letter and newspaper article touched on public safety and use of public funds in supporting an inefficient towing system). Instead, Barstad's email was nothing more

14

than a call to his fellow towing operators to join him in negotiating better payment terms and treatment by the county with respect to their own towing businesses.

Plaintiffs also cite *Gray v. Lacke*, 885 F.2d 399 (7th Cir. 1989), to emphasize that the number of public listeners to which the speech is directed need not be very big. *Gray* involved a jail booking clerk employed by the Dane County Sheriff's Department, who spoke to her supervisors and a newspaper reporter about sexual harassment she experienced, having filed six complaints and grievances about various issues with her union, the county, and the state. *Id*. at 411-12. While the Seventh Circuit found that all of Gray's speech and most of her grievances related solely to the resolution of her personal problems (sexual harassment and compensation), it found the union grievance filed on behalf of all jail booking clerks and seeking reclassification at a higher pay rate *was* protected because the grievance addressed systemic issues affecting other employees and the public. *Id*. at 411-13. However, unlike in *Gray*, Barstad's private email was neither a formal complaint or grievance, much less a public one, nor was he speaking on behalf of other towing operators or raising broader issues impacting the public. Instead, his private email, principally expressing personal dissatisfaction with the way a single towing invoice was handled by the Wisconsin DOJ, and more generally, the length of time he personally had to wait to be paid by the county after the death of a young police officer in the most tragic manner possible, passed along third-hand to the county sheriff, who was obviously grieving over a personally-devastating loss, not just for him, but for his entire office (to say nothing of the deceased officer's family and friends). Indeed, Barstad's letter was very much received by Sheriff Knudson as a private complaint: angrily, as a petty, ham-handed money grab, oblivious to the entire community's painful, open wound at the loss of a young person.

More instructive here is the Supreme Court's decision in *Connick*, 461 U.S. at 141, in which an assistant district attorney, unhappy with her supervisor's decision to transfer her to another division, circulated an intraoffice questionnaire to solicit her co-workers' views on the office transfer policy, office morale, the need for grievance committees, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. The Supreme Court held that with the exception of the final question, the questions posed by plaintiff to her coworkers "do not fall under the rubric of matters of 'public concern,'" mainly because plaintiff "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities, [n]or did [she] seek to bring to light actual or potential wrongdoing or breach of public trust." *Id*. at 148. The same can be said of Barstad's email, "which if released to the public, would convey no information at all other than the fact that a single [contractor] is upset with the status quo" and seeks support from other, private contractors. *Id*.; *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 399 (2011) (quoting *United States v. Treasury Employees*, 513 U.S. 454, 466 (1995)) (Speech "that 'involves nothing more than a complaint about a change in the employee's own duties' does not relate to a matter of public concern and accordingly 'may give rise to discipline without imposing any special burden of justification on the government employer.'"). As in *Connick*, because Barstad's speech in this case touched almost exclusively on matters of private and not public concern, defendants are entitled to summary judgment on plaintiffs' First Amendment claim as well.

ORDER

IT IS ORDERED that plaintiffs' motion for partial summary judgment (dkt. #18) is DENIED, and defendants' motion for summary judgment (dkt. #25) is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 22nd day of September, 2025.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge